**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| THE LAW OFFICES of DR. LLOYD A. NEWTON, ATTORNEY & COUNSELOR at LAW, PLLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 5:26-cv-07206 |
| | § | |
| JENNIFER L. VELARDE; RUSSELL AUSSERESSES; VENTUREKEY, LLC; RUBEN C. DELEON; and DELEON LAW GROUP PC, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff The Law Offices of Dr. Lloyd A. Newton, Attorney & Counselor at Law, PLLC (the "Firm") files this Original Complaint against Defendants Jennifer L. Velarde, Russell Ausseresses, VentureKey, LLC, Ruben C. DeLeon, and DeLeon Law Group PC, and respectfully shows the Court as follows.

## I. NATURE OF THE ACTION

1. This case arises from a secret commission and from the business built with it. Defendant Jennifer L. Velarde was a salaried employee and agent of the Firm. She steered a $40,000 software contract to Defendant Russell Ausseresses and his company, Defendant VentureKey, LLC, after she privately agreed with Ausseresses to "split the total project fee." She disclosed the arrangement only when the Firm asked where to send payment. She never disclosed the amount of her share. She ran the project through a software account that she alone controlled, and the Firm's card paid for that account.

2. The Firm terminated Velarde on April 30, 2026. Twenty-four days later, the domain for a competing statewide traffic-ticket business, “Texas Ticket Attorney,” was registered. The business advertises under the name of Defendant DeLeon Law Group PC. Its website was built on the same platform as the Firm’s project and offers the features that Velarde described to the Firm days before her termination. Velarde promotes the business publicly: “I’m not the attorney. I’m the one behind the scenes making sure the business runs like it should.” The website tells consumers that the business has “10,000+ Cases” and a “4.9/5 Rating.”

3. The Firm does not seek to prevent Velarde, or anyone else, from lawfully competing with it. Velarde signed no covenant not to compete. After April 30, 2026, she was free to work in any lawful business. This action seeks redress for (a) the false and misleading commercial advertising by which Texas Ticket Attorney competes for the Firm’s clients, in violation of Section 43(a)(1)(B) of the Lanham Act; (b) Velarde’s secret commission and the breaches of loyalty that accompanied it; and (c) the knowing participation of those who agreed to pay it.

## II. PARTIES

4. Plaintiff The Law Offices of Dr. Lloyd A. Newton, Attorney & Counselor at Law, PLLC is a Texas professional limited liability company engaged in the practice of law. Its managing member is Lloyd A. Newton, Ph.D., J.D. From December 2, 2024 through March 31, 2026, the Firm maintained its principal office at 1859 W. Summit Ave., San Antonio, Bexar County, Texas 78201. Since April 1, 2026, the Firm has operated remotely from Pipe Creek, Bandera County, Texas, and its mailing address is P.O. Box 63839, Pipe Creek, Texas 78063.

5. Defendant Jennifer L. Velarde (“Velarde”) is an individual who resides in Frisco, Texas. She may be served with process wherever she may be found.

6. Defendant Russell Ausseresses ("Ausseresses") is an individual who resides in Texas and who identifies himself as Co-Founder and CSO of Utility Connect, LLC. He may be served with process wherever he may be found.

7. Defendant VentureKey, LLC ("VentureKey") is a limited liability company that, upon information and belief, Ausseresses owns or controls. It invoiced the Firm for the software project at issue. It may be served through its registered agent or through Ausseresses. Ausseresses and VentureKey are the "Ausseresses Defendants."

8. Defendant DeLeon Law Group PC ("DLG") is a Texas professional corporation with an office at 1714 S. Cooper St., Arlington, Texas 76013. It may be served through its registered agent or at that address.

9. Defendant Ruben C. DeLeon ("DeLeon") is an individual and an attorney licensed in Texas, State Bar No. 00790577. He is the principal of DLG. He may be served with process at 1714 S. Cooper St., Arlington, Texas 76013, or wherever he may be found. DeLeon and DLG are the "DeLeon Defendants."

## III. JURISDICTION AND VENUE

10. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1121(a) because Count One arises under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). The Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

11. The Court has supplemental jurisdiction over the Firm's claims under Texas law under 28 U.S.C. § 1367(a). Those claims and the federal claim arise from a common nucleus of operative fact: the software project that Velarde procured for the Firm, the undisclosed agreement to share its price, and the use of that work, by the same person, in the competing business whose advertising Count One challenges. To the extent that the Texas claims assert

unfair competition, they also lie within 28 U.S.C. § 1338(b), because the Firm joins them with a substantial and related claim under the trademark laws.

12. The Court has personal jurisdiction over each Defendant. Each individual Defendant is domiciled in Texas. Each entity Defendant is organized under the laws of Texas or does business in Texas, and the claims arise from that business.

13. Venue is proper in the San Antonio Division of this District under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claims occurred here. Velarde was employed by the Firm's San Antonio office, and her Firm email signature listed that office's address. The Ausseresses Defendants contracted with, invoiced, and accepted payment from that office. Velarde's nondisclosures were made to the Firm here, and the Firm terminated her here. The challenged advertising solicits clients statewide, including in this District, and the Firm suffers the resulting injury here.

## IV. FACTS

### A. The Firm and its business.

14. The Firm is a high-volume law practice that defends traffic citations and commercial driver's license ("CDL") matters throughout Texas. It also serves clients in Oklahoma. It competes for clients principally through internet advertising under the names "Texas Ticket Doctor" and "TxTicketDr," including through the website TxTicketDr.com. Through its website DrugDefenseTx.com, the Firm also defends drug-paraphernalia charges.

### B. Velarde's employment.

15. The Firm hired Velarde in late December 2025. She began work in the first week of January 2026 as a salaried employee. Her Firm email signature identified her as "Legal Assistant." She had supervisory and operational duties. She has no legal training. When hired,

she represented that her background was in real estate, restaurant management, and professional baseball. She did not represent that she had any software-development training.

**C. Velarde procures a $40,000 project for the Firm and conceals her share of the price.**

16. In early 2026, the Firm sought to replace its client-relationship-management ("CRM") and case-automation software. Acting for the Firm and within the scope of her employment, Velarde recommended Ausseresses and arranged for him to build a custom CRM and related website for the Firm for $40,000 (the "Project"). Dr. Newton gave Ausseresses a written scope of work. In reliance on Velarde's recommendation, and without knowledge of her interest, the Firm committed to the Project.

17. Velarde asked the Firm to approve $500 for a subscription to Lovable, an artificial-intelligence software-building platform, for the Project. Lovable then charged the Firm's business card ending in 6977 six times between February 24 and April 10, 2026, for a total of $1,940.12. Velarde maintained the Lovable account under her own login. When she demonstrated the Project to Dr. Newton, she logged in with her own credentials. The Firm has never had independent access to the account. On April 16, 2026, Velarde wrote of the charges above the approved amount: "I take responsibility for that."

18. Before the Firm committed to the Project and funded the Lovable account, Velarde did not disclose that she had any personal financial interest in the Project. On or about April 13, 2026, Dr. Newton asked how the first payment should be made. Velarde then disclosed, for the first time, that she would personally receive a share of the $40,000. She did not state the amount. That evening the Firm sent $5,000 toward the Project by Zelle, as it had earlier committed to do.

19. On April 15, 2026, Dr. Newton wrote to Velarde that her "personal financial cut" was "a significant conflict of interest" that "should have been disclosed to me from the very beginning." He paused further payments. He asked for "[f]ull written disclosure of your financial arrangement with Russell — specifically, how much you are receiving and how it was structured," and for "written confirmation that it will belong to the firm and not to you or Russell."

20. Velarde responded on April 16, 2026. She admitted: "Russell and I agreed to split the total project fee based on our respective contributions." She characterized the arrangement as "independent contractor work." She proposed that the Firm pay Ausseresses directly and stated that she "will rely on my separate agreement with Russell regarding my portion of the work." She did not state the amount of her share. She represented that the deliverable "includes ownership and control by the firm, not by Russell or myself."

21. On April 21, 2026, Ausseresses wrote to Dr. Newton and confirmed the arrangement. He wrote that "Jennifer and I partnered on this build." He described the Project as "a one-time build, fully owned by your firm" and "a system your firm owns outright." He attached Invoice VK-2026-001 for $40,000, payable to VentureKey, and directed: "You may remit payment to me, and I'll handle distribution in accordance with my agreement with Jennifer."

22. On April 25, 2026, Dr. Newton again asked Velarde in writing: "What is your cut of the total $40k bill?" Velarde answered on April 27, 2026, only that "I get a percentage of the deal" and that "[w]e will have to revisit the percentage." She wrote that Ausseresses was "paying me to maintain/tweak as necessary." She described the Project as "an entire Software Soley for you and your firm." She has never disclosed the amount of her share.

23. In the same email of April 27, 2026, Velarde described the system being built for the Firm. It included a website "chat box bot" through which "clients can actually upload their citation, AI will read it and automatically populate it into our CRM"; staff and client logins; "Blogs [that] are automatically created . . . in order to optimize SEO"; and integration with Dialpad.

**D. The Firm terminates Velarde, who keeps the Project.**

24. On April 30, 2026, the Firm terminated Velarde's employment because she had held an undisclosed personal financial interest in a contract that she negotiated for the Firm and had refused to disclose its amount. The termination notice demanded that Velarde deliver "full written documentation of all work completed to date, all Lovable AI account credentials, and any project access, logins, or assets belonging to the firm." Velarde returned the Firm's iPhone. She has not delivered the credentials, the documentation, or any Project asset. The Firm has made no further payment on the Project.

**E. Texas Ticket Attorney appears within weeks.**

25. On May 24, 2026, the domain txticketattorney.com was registered through GoDaddy, with the registrant's identity concealed by a privacy service. The website at that domain, "Texas Ticket Attorney" ("TTA"), advertises statewide Texas defense of traffic tickets, CDL violations, warrants, failure-to-appear charges, DWI, and drug-paraphernalia charges. It competes directly with the Firm for the same clients through the same channel.

26. The TTA website identifies itself as "TEXAS TICKET ATTORNEY / DELEON LAW GROUP" and lists the address 1714 S. Cooper St., Arlington, Texas 76013, which is DLG's office address. DeLeon's public State Bar of Texas profile and DLG's own website

describe a practice in intellectual property, commercial litigation, corporate matters, and estate planning. Neither describes any practice in traffic, CDL, or criminal defense.

27. The TTA website was built with Lovable. Its social-share image is served from Lovable's file storage at an address that contains the Lovable account identifier rg25f3qGl9ebN57fLNRu5S5xCqi2 and the file name "TTA_Logo." The website offers features that Velarde described to the Firm on April 27, 2026: an artificial-intelligence tool that reads an uploaded photograph of a citation, a client login, an automatically generated blog, and Dialpad telephone integration.

28. Velarde publicly promotes TTA on social media under her own name, listing the website's telephone number, 832-304-5758. In a public Facebook post she wrote: "I'm not the attorney. I'm the one behind the scenes making sure the business runs like it should. New business. New lane. Same Jenn."

29. Upon information and belief, based on machine-generated timestamps that the TTA website publicly serves, the first articles of the TTA blog were generated on February 25, 2026, the day after Lovable first charged the Firm's card, and a majority of the blog's 61 articles were generated before April 30, 2026, while Velarde was the Firm's salaried employee.

30. Upon information and belief, Velarde and the Ausseresses Defendants developed the TTA website, its database, and its automation, in whole or in substantial part, during Velarde's employment and with the Firm's funds and Lovable subscription. In the alternative, Velarde used the Firm's funds and Lovable subscription during her employment to build a competing business for herself. Either course breached her duty of loyalty.

**F. The advertising statements.**

31. As of November 2026, the TTA website made the following statements of fact to consumers (the "Advertising Statements"): (a) "10,000+ Cases," on the page txticketattorney.com/case-review; (b) "4.9/5 Rating," on the same page; and (c) "Trusted by thousands of Texas drivers," on the page txticketattorney.com/services.

32. The Advertising Statements are false or misleading. The TTA domain was registered on May 24, 2026. The website's Terms and Conditions state "Last updated: May 29, 2026." Velarde describes TTA as a "[n]ew business." A business of that age has not handled more than ten thousand cases and has not earned the trust of thousands of Texas drivers. The website identifies no source for the "4.9/5 Rating," and, upon information and belief, none exists. To the extent the Advertising Statements refer to the experience of DLG, they mislead, because DLG's practice is not a traffic-defense practice.

33. Velarde and DLG made, caused, or authorized the Advertising Statements. The website bears DLG's name and office address. Velarde operates and promotes the business. Upon information and belief, DeLeon, as DLG's principal, authorized the use of DLG's name and address on the website and approved its content.

**G. Injury to the Firm.**

34. Defendants' conduct has injured the Firm. The Firm paid $5,000 toward the Project and $1,940.12 in Lovable charges. It paid Velarde a salary while she served a conflicting interest. It has been deprived of the Project and of access to the account in which the Project resides. It is losing clients and goodwill to a competitor that attracts the Firm's prospective clients with false and misleading statements. A consumer who chooses a traffic or CDL lawyer

from internet advertising relies on the lawyer's stated experience and reputation, and the Advertising Statements divert such consumers from the Firm.

## V. CLAIMS FOR RELIEF

### COUNT ONE

### False Advertising — Lanham Act § 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B) (against Velarde and the DeLeon Defendants)

35. The Firm incorporates the preceding paragraphs.

36. The Advertising Statements are statements of fact made in commercial advertising or promotion. They appear on a public website that solicits clients. ***Seven-Up Co. v. Coca-Cola Co.***, 86 F.3d 1379, 1384 (5th Cir. 1996).

37. The Advertising Statements misrepresent the nature, characteristics, and qualities of the services that TTA offers. They are literally false or, at a minimum, misleading. They have deceived or have the capacity to deceive a substantial segment of their audience. The deception is material, because the volume of a lawyer's experience and the lawyer's rating are central to a consumer's choice of legal services. Defendants placed the statements in interstate commerce through the internet. ***Pizza Hut, Inc. v. Papa John's International, Inc.***, 227 F.3d 489, 495 (5th Cir. 2000).

38. The Firm and TTA compete directly for the same clients. The Firm's injury, lost clients and injury to its reputation and goodwill, falls within the zone of interests that the Lanham Act protects, and the deception proximately causes it. ***Lexmark International, Inc. v. Static Control Components, Inc.***, 572 U.S. 118, 131–34 (2014).

39. Velarde and the DeLeon Defendants acted knowingly and willfully. The Firm is entitled to injunctive relief under 15 U.S.C. § 1116, including the rebuttable presumption of irreparable harm that § 1116(a) provides, and to Defendants' profits, the Firm's damages,

enhanced damages, and costs under 15 U.S.C. § 1117(a), and to reasonable attorney's fees because this is an exceptional case.

**COUNT TWO**

**Breach of Fiduciary Duty and Equitable Forfeiture**
**(against Velarde)**

40. The Firm incorporates the preceding paragraphs.

41. As the Firm's employee and agent, Velarde owed the Firm a fiduciary duty of loyalty in matters within the scope of her agency. That duty included the duty not to acquire a personal financial interest adverse to the Firm in a transaction that she negotiated for it, the duty to disclose any such interest fully, the duty not to accept a secret commission from the other party to the transaction, and the duty not to use the Firm's funds or property for her own benefit. ***Kinzbach Tool Co. v. Corbett-Wallace Corp.***, 160 S.W.2d 509, 514 (Tex. 1942); ***Johnson v. Brewer & Pritchard, P.C.***, 73 S.W.3d 193, 200–02 (Tex. 2002).

42. Velarde breached those duties. She secretly agreed to receive a share of the Firm's $40,000 Project price and concealed the agreement until the Firm asked how to pay. She refused to disclose the amount. She caused the Firm to pay for a software account that she alone controlled and exceeded the approved amount by $1,440.12. She retained the Project and its credentials after written demand. She used the Firm's funds and software subscription, during her employment, for a business other than the Firm's.

43. Velarde's breaches injured the Firm and benefited her. The Firm seeks actual damages, disgorgement of every benefit that Velarde obtained through her breaches, and forfeiture of the compensation that the Firm paid her during her period of disloyalty, which, upon information and belief, began no later than late February 2026. ***Burrow v. Arce***, 997 S.W.2d 229, 240 (Tex. 1999); ***ERI Consulting Engineers, Inc. v. Swinnea***, 318 S.W.3d 867, 873–75 (Tex.

2010). Equitable forfeiture does not depend on proof of actual damages. This Count rests on the secret commission, the nondisclosure, and the misuse of the Firm's funds. It does not rest on the misappropriation of a trade secret.

**COUNT THREE**

**Knowing Participation in Breach of Fiduciary Duty**
**(against the Ausseresses Defendants)**

44. The Firm incorporates the preceding paragraphs.

45. A third party who knowingly participates in a fiduciary's breach of duty becomes a joint tortfeasor with the fiduciary. ***Kinzbach***, 160 S.W.2d at 514. The Ausseresses Defendants knew that Velarde acted as the Firm's employee and agent in procuring the Project. They nonetheless agreed to "split the total project fee" with her without disclosure to the Firm, and they directed the Firm to pay Ausseresses for "distribution in accordance with my agreement with Jennifer."

46. The Ausseresses Defendants are jointly and severally liable with Velarde for the resulting damages, and they must disgorge the benefits that they obtained.

**COUNT FOUR**

**Fraud by Nondisclosure**
**(against Velarde)**

47. The Firm incorporates the preceding paragraphs.

48. As the Firm's fiduciary, Velarde had a duty to disclose her financial interest in the Project. Between her recommendation of Ausseresses in early 2026 and April 13, 2026, she deliberately remained silent about that material fact. She knew that the Firm was ignorant of it and lacked an equal opportunity to discover it. She intended that the Firm act without knowledge of it. The Firm relied on her silence when it committed to the Project, furnished its scope of

work, and funded the Lovable account, and the Firm was injured as a result. ***Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC***, 572 S.W.3d 213, 219–20 (Tex. 2019).

**COUNT FIVE**

**Rescission, Declaratory Judgment, and Money Had and Received**
**(against Velarde and the Ausseresses Defendants)**

49. The Firm incorporates the preceding paragraphs.

50. An agreement procured through a secret arrangement between a principal's agent and the other contracting party is voidable at the principal's election. ***Kinzbach***, 160 S.W.2d at 514. The Firm elects to avoid the Project agreement. The Firm seeks a declaration under 28 U.S.C. § 2201 that the agreement reflected in Invoice VK-2026-001 is voidable and has been avoided and that the Firm owes no further sum under it.

51. The recipient of the Firm's $5,000 payment holds money that in equity and good conscience belongs to the Firm. ***Staats v. Miller***, 243 S.W.2d 686, 687 (Tex. 1951). The Firm seeks restitution of that sum. In the alternative to rescission, and if the proof shows that the Project has value, the Firm will elect before judgment to affirm the agreement and to claim the Project through the constructive trust described below.

**VI. REMEDIES**

52. *Constructive trust and accounting.* Velarde and the Ausseresses Defendants obtained the Project, and the account in which it resides, through Velarde's breach of fiduciary duty and their knowing participation in it. The Firm asks the Court to impose a constructive trust in its favor over the Lovable account and projects associated with the identifier rg25f3qGl9ebN57fLNRu5S5xCqi2 or funded by the Firm's card, over all work derived from the Project, and over their traceable proceeds, and to order an accounting of all sums that Velarde

and the Ausseresses Defendants received or agreed to receive from the Project. ***Meadows v. Bierschwale***, 516 S.W.2d 125, 128–29 (Tex. 1974).

53. *Injunctive relief*. The Firm is filing, as a separate instrument under Local Rule CV-65, an Application for Temporary Restraining Order and Preliminary Injunction. On final judgment, the Firm seeks a permanent injunction against publication of the Advertising Statements and an order directing delivery of the Project and its credentials to the Firm, if the Firm elects to affirm.

54. *Exemplary damages*. Velarde and the Ausseresses Defendants acted with fraud and malice. The limitation in Tex. Civ. Prac. & Rem. Code § 41.008(b) does not apply, because their conduct constitutes commercial bribery under Texas Penal Code § 32.43, committed knowingly or intentionally. Tex. Civ. Prac. & Rem. Code § 41.008(c). Velarde, an employee and agent of the Firm, agreed to accept a benefit from the Ausseresses Defendants without the Firm's consent, on the understanding that the benefit would influence her conduct in relation to the Firm's affairs, and the Ausseresses Defendants agreed to confer it.

55. *Conditions precedent*. All conditions precedent to the Firm's claims have been performed, have occurred, or have been excused.

## VII. JURY DEMAND

56. Under Federal Rule of Civil Procedure 38, the Firm demands a trial by jury on all issues so triable.

## VIII. PRAYER

The Firm asks that Defendants be summoned to appear and answer, and that the Court grant the following relief.

1. A temporary restraining order and, after hearing, a preliminary injunction, as requested in the Firm's separate Application.

2. Judgment against Velarde and the DeLeon Defendants under the Lanham Act for Defendants' profits, the Firm's damages, enhanced damages, and a permanent injunction against the Advertising Statements.

3. Judgment against Velarde and the Ausseresses Defendants, jointly and severally, for actual damages, disgorgement, and forfeiture of the compensation paid to Velarde during her period of disloyalty.

4. A declaration that the Project agreement is voidable and has been avoided and that the Firm owes no further sum under it, with restitution of $5,000; or, at the Firm's election, a constructive trust over the Project and an order for its delivery.

5. An accounting.

6. Exemplary damages.

7. Reasonable attorney's fees under 15 U.S.C. § 1117(a), pre-judgment and post-judgment interest, and costs.

8. All other relief, at law or in equity, to which the Firm is justly entitled.

Dated: November 16, 2026.

Respectfully submitted,

**THE LAW OFFICES OF DR. LLOYD A. NEWTON, ATTORNEY & COUNSELOR AT LAW, PLLC**

By: /s/ Lloyd A. Newton
Lloyd A. Newton, Ph.D., J.D.
State Bar No. 24122874
P.O. Box 63839
Pipe Creek, Texas 78063
Telephone: (210) 210-1616
Facsimile: (276) 900-1632
Lloyd@NewtonsLawTX.com
**ATTORNEY FOR PLAINTIFF**